**SECOND DIVISION**
**ANDREWS, P. J.,**
**MILLER and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**November 20, 2015**

# In the Court of Appeals of Georgia

A15A1471. WALTERS v. THE STATE.

BRANCH, Judge.

A jury found Alonzo Ricardo Walters guilty of aggravated assault and possession of a knife during the commission of a felony. He appeals, arguing that the trial court improperly allowed the State to introduce the victim's prior consistent statement. Finding no reversible error, we affirm.

Viewed in a light favorable to the verdict, the record shows that around 4 a.m. on October 10, 2012, Valerie Mike stopped at a convenience store in Savannah to buy gas on her way to work. She testified that as she was pumping gas, a man approached her and asked for a cigarette, but Mike told him that she did not smoke. The man then pulled out a butcher knife and demanded money. Mike screamed, ran into the store, and called 911 on her cellphone, while the man fled on foot.

The clerk who was working in the store testified that she heard a scream, looked out the store window, saw Mike standing face-to-face with a man who had been in the store several times earlier that morning, and then saw Mike running toward the store. When Mike was halfway to the door, the clerk heard her scream, "Oh my God, oh my God, he's trying to rob me." When Mike entered the store, the clerk heard her say, "Oh my God, he got a knife." At trial, the clerk identified Walters as the man in question.

Officer James Neff of the Savannah-Chatham Metropolitan Police Department responded to the 911 call. Neff testified that Mike was "almost crying, shaking, [and] upset," but he was able to calm her down so that she could tell him what had happened. Neff then related what Mike had told him – that she had been pumping gas when a man approached her and asked for a cigarette, then pulled out a knife and demanded money, after which she screamed and ran into the store. As Neff was recounting Mike's story, defense counsel interrupted: "Your Honor, I'm going to object to this line of questioning. It's just simply to bolster what Ms. Mike has already testified to. She hasn't been impeached on that." The prosecutor responded, "I don't believe it's hearsay. I believe that she's already testified and was subject to cross-

examination, so I don't feel that it's hearsay." The court overruled defense counsel's objection, and Neff finished recapping what Mike had said.

Neff then testified that after speaking with Mike, he broadcast her description of her assailant over the police radio, and within minutes other officers found a man in the area matching the description, along with a large butcher knife in some nearby bushes. Neff took Mike to the man's location for a show-up, and she positively identified the man – who turned out to be Walters – as the one who had threatened her with the knife.

Walters was arrested, taken to the police station, and interviewed by a detective. He told the detective that he had first encountered Mike when she pulled into the gas station and yelled at him to move out of the way, prompting him to respond with an expletive. Walters said that Mike was "reaching for something," so he pulled out his knife in self-defense. He denied asking her for cigarettes or money.

Walters gave a different account at trial. There, he admitted that he had approached Mike while she was pumping gas, but claimed that "it wasn't about robbery. It was about something else." Specifically, Walters testified that he wanted "to see if I can have sex with [Mike]." He insisted that he had displayed his knife only in self-defense after seeing Mike reach for something in her clothing. Walters

3

explained that he had lied to the detective about his initial encounter with Mike because he was afraid of being charged with sexual assault.

Walters was charged with aggravated assault and possession of a knife during the commission of a felony. At trial, his defense – as argued by his attorney – was that "Valerie Mike jumped to the wrong conclusion because of [her] misperceptions about what was actually going on and she became hysterical, which clouded her judgment and perception." The jury found him guilty of both crimes.

On appeal, Walters asserts one enumeration of error – that the trial court erred by allowing Neff to testify about what Mike had told him. In particular, Walters argues that the State had no permissible reason to introduce Mike's prior consistent statement because "there was no charge of recent fabrication, improper influence or improper motive asserted by Mr. Walters during his cross examination of Ms. Mike." We agree that Walters did not attack Mike's credibility by charging her with recent fabrication or improper influence or motive. Under Georgia's new Evidence Code, however, our analysis does not end there.

Before the implementation of the new Evidence Code, "Georgia had no statute governing the admission of prior consistent statements." *Grant v. State*, 326 Ga. App. 121, 128 (4), n. 4 (756 SE2d 255) (2014). Case law established a general rule that "a

4

witness' testimony cannot be fortified or corroborated by his own prior consistent statements." *Parker v. State*, 162 Ga. App. 271, 274 (5) (290 SE2d 518) (1982) (citations omitted). Such statements could be admitted, however, to rehabilitate a witness if the veracity of the witness's trial testimony had been placed in issue at trial and the witness was present at trial and available for cross-examination. *Williams v. State*, 292 Ga. 844, 849 (3) (c) (742 SE2d 445) (2013). A witness's veracity was placed in issue only in limited circumstances – if "affirmative charges of recent fabrication, improper influence, or improper motive [were] raised during cross-examination." Id. (citation omitted). In the absence of affirmative charges of recent fabrication or improper influence or motive, prior consistent statements were "hearsay evidence improperly admitted to bolster the witness's credibility in the eyes of the jury." *Baugh v. State*, 276 Ga. 736, 738 (2) (585 SE2d 616) (2003) (citations and punctuation omitted).

The new Evidence Code, effective January 1, 2013, specifically addresses prior consistent statements:

> A prior consistent statement shall be admissible to rehabilitate a witness *if the prior consistent statement logically rebuts an attack made on the witness's credibility*. A general attack on a witness's credibility

5

with evidence offered under Code Section 24-6-608 or 24-6-609[1] shall not permit rehabilitation under this subsection. If a prior consistent statement is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive, the prior consistent statement shall have been made before the alleged recent fabrication or improper influence or motive arose.

OCGA § 24-6-613 (c) (emphasis supplied).[2] According to its plain terms, this new rule allows the admission of prior consistent statements if they logically rebut *any* attack on a witness's credibility, except for attacks upon his character for truthfulness or evidence of his prior convictions. Accordingly, our inquiry is not limited to asking whether Walters impugned Mike's credibility by charging her with recent fabrication or improper influence or motive. We must also consider whether Walters attacked Mike's credibility on other grounds. Pre-OCGA § 26-6-613 precedent is of little help in addressing this question because our definition of what constituted an attack on

---

[1] OCGA § 24-6-608 concerns evidence of a witness's conduct and character for truthfulness, and OCGA § 24-6-609 involves impeachment by evidence of a prior conviction.

[2] Georgia's new hearsay rule also addresses prior consistent statements, as follows: "An out-of-court statement shall not be hearsay if the declarant testifies at the trial or hearing, is subject to cross-examination concerning the statement, and the statement is admissible as a prior inconsistent statement or a prior consistent statement under Code Section 24-6-613 or is otherwise admissible under this chapter. OCGA § 24-8-801 (d) (1) (A)."

6

credibility was narrower then. We therefore turn to federal law. See *Parker v. State*, 296 Ga. 586, 592 (3) (a) (769 SE2d 329) (2015) ("[W]here the new Georgia rules mirror their federal counterparts, it is clear that the General Assembly intended for Georgia courts to look to the federal rules and how federal appellate courts have interpreted those rules for guidance.").

Under federal law, the admissibility of prior consistent statements is governed by Federal Rule of Evidence 801 (d) (1) (B), which was recently amended. The version of that rule that was in effect when OCGA § 24-6-613 was enacted provided that a prior consistent statement was inadmissible hearsay unless it was made by a testifying witness available for cross-examination and was "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." *Tome v. U. S.*, 513 U. S. 150, 157 (II) (A) (115 SCt 696, 130 LE2d 574) (1995), citing Fed. R. Evid. 801 (d) (1) (B) (1974). Under the then-existing federal rule, "[p]rior consistent statements may not be admitted to counter all forms of impeachment," but only to "rebut a charge of 'recent fabrication or improper influence or motive.'" *Tome*, 513 U. S. at 157 (II) (A) (citation and punctuation omitted). Thus, OCGA § 24-6-613 does not mirror the former federal rule, which – like Georgia law before the new Evidence Code – narrowly defined the kind of

7

credibility attack that could justify the admission of a prior consistent statement. Accordingly, federal precedent interpreting the former federal rule is also of little help here.

The federal rule was amended in 2014, however, and it now provides that a declarant-witness's prior consistent statement is admissible if offered "(i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; *or* (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground." Fed. R. Evid. 801 (d) (1) (B) (2014) (emphasis supplied). This language is not identical to that of OCGA § 24-6-613 (c), which allows a prior consistent statement if it "logically rebuts an attack made on the witness's credibility." Nevertheless, OCGA § 24-6-613 (c) and newly amended Fed. R. Evid. 801 (d) (2) (B) both broaden the scope of credibility attacks that can trigger admissibility of a prior consistent statement, such that precedent interpreting the latter may be useful in construing the former. Given the newness of the federal rule, there is little precedent interpreting it, and none addressing the issue we face here.

But the advisory committee notes accompanying the new federal rule may be instructive:[3]

> [The former rule] covered only those consistent statements that were offered to rebut charges of recent fabrication or improper motive or influence. The Rule did not, for example, provide for substantive admissibility of consistent statements that are probative to explain what otherwise appears to be an inconsistency in the witness's testimony. Nor did it cover consistent statements that would be probative to rebut a charge of faulty memory. Thus, the Rule left many prior consistent statements potentially admissible only for the limited purpose of rehabilitating a witness's credibility. . . . The intent of the amendment is to extend substantive effect to consistent statements that rebut other

---

[3] "[A]s judges, we should only be concerned with what laws actually say, not by what the people who drafted the laws intended." *Day v. Floyd County Bd. of Educ.*, 333 Ga. App. 144, 151 (775 SE2d 622) (2015) (Dillard, J., concurring) (punctuation and footnotes omitted). Unlike ordinary legislative history, however, advisory committee notes are generated by a committee of judges, professors, and practitioners who are appointed by the Chief Justice of the United States and who engage in a lengthy process of drafting and revision, culminating in approval by the Supreme Court and submission to Congress. See Thomas E. Baker, *An Introduction to Federal Court Rulemaking Procedure*, 22 Tex. Tech. L. Rev. 323, 329-331 (1991); see also 28 USC § 2072 ("Rules of procedure and evidence; power to prescribe"). Although advisory committee notes cannot change the plain meaning of the federal rules of evidence, they are "assuredly persuasive scholarly commentaries – ordinarily *the* most persuasive – concerning the meaning of the rules." *Tome*, 513 U. S. at 161 (Scalia, J., concurring in part and concurring in the judgment); see also *Horenkamp v. Van Winkle & Co.*, 402 F.3d 1129, 1132 (II) (11th Cir. 2005) (advisory committee notes "are nearly universally accorded great weight in interpreting federal rules") (citation and punctuation omitted).

attacks on a witness – such as the charges of inconsistency or faulty memory. The amendment does not change the traditional and well-accepted limits on bringing prior consistent statements before the factfinder for credibility purposes. It does not allow impermissible bolstering of a witness. As before, prior consistent statements under the amendment may be brought before the factfinder only if they properly rehabilitate a witness whose credibility has been attacked.

See Fed. R. Evid. 801, Advisory Committee Notes. Thus, the advisory committee notes indicate that while prior consistent statements remain inadmissible under federal law to bolster a witness's testimony, they may now come in to rebut a broad range of attacks on a testifying witness's credibility.

With this backdrop, we return to the question of whether Walters attacked Mike's credibility in some way other than by charging her with recent fabrication or improper influence or motive. Our review of the record shows that he did. On cross-examination, defense counsel asked Walters about her 911 call, which had been played for the jury during her direct examination but apparently was unintelligible in parts. Defense counsel asked Mike several times whether she had told the 911 operator that Walters had a gun or a knife. Defense counsel also established that Mike was very upset by the incident. Later, Walters took the stand and testified that he had actually approached Mike for sex and had brandished his knife only when he thought

10

she was reaching for a weapon of her own. During closing argument, defense counsel stated: "Was Mike lying? No. I don't say she's lying. I think she's convinced that what she said was the truth." Counsel suggested, however, that Mike became so upset when Walters approached her that she misinterpreted his intentions. Counsel further told the jury that they should acquit Walters "[i]f your mind is unsettled, wavering, or unsatisfied about whether or not Ms. Mike is believable or if her memory of events was faulty because of hysteria." Thus, while Walters did not call Mike a liar, he nevertheless attacked her credibility by suggesting that she had misidentified Walters's weapon during her 911 call and that her account of the events was not believable due to her heightened emotional state.[4]

Because Mike's credibility was attacked, her prior consistent statements to Neff were admissible if they "logically rebut[ted]" the attack. OCGA § 24-6-613 (c). Mike's prior statement that her assailant had wielded a knife logically rebutted Walters' suggestion that she had misidentified the weapon. And Mike's prior

---

[4] Although some of these credibility attacks occurred after Mike's prior consistent statement was introduced through Neff's testimony, a prior inconsistent statement may be admissible if the testifying witness's credibility was "eventually attacked" at a later point in the trial. *Pate v. State*, 315 Ga. App. 205, 207 (1) (a) (726 SE2d 691) (2012), citing *Sterling v. State*, 267 Ga. 209, 213 (9) (477 SE2d 807) (1996).

statement that she did not scream and flee until Walters pulled the knife logically rebutted his claim that she was so upset when he initially approached her that she misconstrued his intentions. Thus, we conclude that the portions of Neff's testimony recounting these statements were admissible under OCGA § 24-6-613 (c).

That leaves the remainder of Neff's testimony about Mike's statement – that Walters asked for a cigarette, then pulled out a knife and demanded money. We question whether the consistency between this part of Mike's account to the responding officer and her testimony at trial logically rebuts Walters's charge that her perception of the entire encounter was clouded by hysteria. We conclude, however, that even if the admission of the remainder of Mike's prior consistent statement was erroneous, any error was harmless.

Because "[t]he improper admission of bolstering evidence is a non-constitutional, evidentiary error, . . . we must determine whether it is 'highly probable' that the error did not contribute to the jury's guilty verdict." *Cowart v. State*, 294 Ga. 333, 341 (4) (b) (751 SE2d 399) (2013) (citation omitted). In making this determination, we may not rely on the fact that Mike gave testimony at trial that was consistent with her prior statements to Neff, "as the very nature of the error in admitting the prior consistent statement is that it is repetitive of that to which the

witness has already testified." *Character v. State*, 285 Ga. 112, 120 (6) (674 SE2d 280) (2009) (punctuation and footnote omitted). However, we note that the sales clerk working at the gas station testified that she heard Mike scream, "oh my God, he's trying to rob me" as she ran into the store. Police found Walters with a knife nearby, and he later admitted to a detective that he had encountered Mike at the gas station and eventually pulled out a knife. To the extent that the case boiled down to a credibility contest between Mike and Walters as to whether he asked her for a cigarette and money (as she claimed) or for sex (as he claimed), the fact that Walters told a different story to the investigating detective than he did at trial undermined his credibility, while there was no evidence that Mike had made any prior inconsistent statements. Under these circumstances, we conclude that it is not probable that the admission of the remainder of Mike's prior consistent statement contributed to the verdict and that any error was therefore harmless.

*Judgment affirmed. Andrews, P. J., and Miller, J., concur.*